Ray HARRISON and Mary Harrison

v.

ARLINGTON INDEPENDENT SCHOOL DISTRICT, et al.

Civ. A. No. 4–87–292–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

May 31, 1989.

John D. Gilliland, Baldwin, Gilliland, Dallas, Tex., John B. Garrett, Garrett & Burkett, Fort Worth, Tex., David S. Jones, Dallas, Tex., for plaintiffs.

Donald K. Buckman, John F. Gray, Cantey & Hanger, Fort Worth, Tex., Eric D. Ryan, Judith C. Bridges, Busch, Ryan & Seib, Dallas, Tex., for defendants.

MEMORANDUM OPINION
AND ORDER

MAHON, District Judge.

Ripe for adjudication is the second motion of the Arlington Independent School District (AISD), Dr. Donald L. Wright, and the AISD Board of Trustees, defendants, for summary judgment.

At the outset of this litigation, the defendants moved for summary judgment on the basis of a release agreement executed by the plaintiffs, Ray and Mary Harrison. In an unusual hybrid of pleading and controverting affidavit, the Harrisons' "verified response" alleged that the release agreement was invalid, as they purportedly en-

tered into it unknowingly and involuntarily. The Harrisons argued that their heightened emotional state viewed in light of certain alleged deceptive and, of course, clandestine, acts on the part of the school district induced them to submit to an agreement they otherwise might not have.

The Court denied the defendants' first motion for summary judgment and hoped to limit discovery to the single issue of the validity of the release agreement. That hope perished several depositions ago—thirty have now been taken on this issue. Despite the expansive nature of the discovery, the defendants say that the Harrisons have produced no significant probative evidence of fraud, duress, or coercion which would invalidate the release agreement. For the reasons set forth below, the Court must concur in this assessment of the Harrisons' case.

### Statement of the Case

In exchange for almost $109,000.00 (the approximate value of Mr. Harrison's remaining services under his employment contract at a salary of $51,000.00 annually), the Harrisons entered into a release agreement with the AISD. The Harrisons promised to:

> release all rights, claims or privileges which [Ray Harrison] may have by reason of his employment, or in the alternative, any term contract of employment ... [and to] release and discharge the Arlington Independent School District from any and all claims [the Harrisons] have or might have as of this date, *whether known or unknown.*

(Emphasis added).

After being suspended with pay from his position as AISD's director of data processing, Mr. Harrison had retained the law firm of Hill, Heard, O'Neal, Gilstrap & Goetz. The Harrisons were counseled during the negotiation of the release agreement by attorneys Frank Hill and Marcia Wise, who were members of the Hill, Heard firm and experienced in labor law matters.

Mr. Harrison's suspension came upon the brink of near catastrophic conditions in the AISD's data processing department. Although not particularly relevant to the vol-

untariness inquiry in issue, summary judgment evidence suggests that the data processing operations under Mr. Harrison's supervision were in an ominous state of disarray. His department appeared to be at the mercy of a computer technician who worked nocturnally and sporadically, often from a make-shift office at Denny's Restaurant or from an unauthorized computer terminal installed in the technician's home. An audit performed by the big-eight accounting firm of Deloitte, Haskins & Sells (DH & S) during Mr. Harrison's suspension revealed several significant deficiencies in data processing operations and control.

The AISD data processing department was floundering. Work-tracking systems were not in place, and vital computer programs were not consistently documented. Supervisory controls were extremely lax, and management responsibilities for the department were largely undelegated. Password controls to access sensitive database information were virtually nonexistent. The school district's hardware needs appeared significantly (and expensively) overdeveloped, while little attention was devoted to software improvements, user needs, and micro-computer development.

Despite the gravity of these deficiencies and nine years of continuous employment, Mr. Harrison was not informed of the school district's dissatisfaction with his performance until he received his termination letter from the Board of Trustees shortly after his suspension. The Trustees' letter stated that Mr. Harrison's contract was being terminated for "good cause."

Mr. Hill, as Mr. Harrison's attorney, demanded detailed information supporting the accusations against Mr. Harrison and the reasons for his termination. Chester Ball, the school district's attorney, willingly obliged. He sent Hill a fourteen page letter, which disclosed 29 documents relevant to Mr. Harrison's termination, 22 witnesses allegedly willing to testify against Harrison, and a seemingly countless list of acts of insubordination, incompetence, job neglect, and policy infractions.

Established school district procedure entitled Mr. Harrison to an open hearing before the Board of Trustees so that evidence demonstrating "good cause" for his termination could be presented and to enable him to respond to the accusations and the evidence against him. Mr. Hill, on Mr. Harrison's behalf, requested such a hearing, and one was immediately scheduled.

During the time after Mr. Harrison had been suspended but prior to the hearing before the school board, an article appeared in the *Arlington Citizen–Journal* which stated that Mr. Harrison had been terminated because of the DH & S audit. Mr. Harrison, through his attorneys, characterized the immoderate newspaper account as "slanderous per se" and filed suit in the Tarrant County District Court. For reasons that are unclear, Mr. Harrison's open hearing before the school board was never held. But, on July 1, 1986, the Harrisons entered into the release agreement with the school district in which they agreed to dismiss the state court defamation action against the AISD and Dr. Wright and to release the school district from any claims they had, or might have, "whether known or unknown," in exchange for approximately $109,000.00.

Despite the expansive and unambiguous language of the release agreement, Mr. Harrison filed an age discrimination charge with the Equal Employment Opportunity Commission four months later. Then, 10 months after the release agreement had been executed, Mr. Harrison, now represented by new counsel, filed this action which alleged unlawful termination, age discrimination, and various due process violations. Despite the torturous length of their briefs, supporting deposition excerpts, and documentary evidence, the Harrisons have failed to produce a shred of relevant evidence of coercion, duress, or fraud sufficient to demonstrate that the promise they made to relinquish all claims against the school district was anything other than completely voluntary and knowing.

### Analysis

■ The party attacking the validity of a settlement bears the burden of proving that the agreement is tainted or that both parties acted pursuant to a mutual mistake. *Callen v. Pennsylvania R.R. Co.*, 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242 (1948). As the summary judgment movant, the defendants bore at least the responsibility of informing the Court that no genuine issue of material fact existed concerning the validity of the release agreement. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). But once the defendants pointed out the absence of any probative evidence of fraud, coercion, or duress surrounding the execution of the release agreement—an issue in which the Harrisons' bore the burden of proof—the Harrisons were required to produce affirmative evidence, more than a "metaphysical doubt," concerning the agreements' alleged invalidity. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the nonmovants, the Harrisons were compelled to come forward with specific facts showing a genuine issue for trial.

In this case, the defendants at the outset go beyond their initial responsibility of merely "pointing out" the absence of evidence supporting the Harrisons' invalidity claim. Instead, the defendants broach their summary judgment attack on two fronts. First, they assert that the Harrisons have no evidence of fraud or duress surrounding the execution of the release agreement, and, second, they proffer significant probative evidence indicating that the Harrisons' agreement to release the school district from liability was both knowing and voluntary.

When determining whether a party's release was knowing and voluntary, courts have examined the sophistication of the party entering into the agreement. *See e.g., Rogers v. General Elec. Co.*, 781 F.2d 452, 465 n. 8 (5th Cir.1986). Here, undisputed summary judgment discloses that Mr. Harrison is no bumpkin. As recipient of a master degree, he appears well-educated. On the face of the Plaintiffs' complaint, Mr. Harrison is touted as a person

with business acumen. He is described as a recognized professional in the data processing field and extolled for developing an "extremely efficient" computer system in the AISD while maintaining department morale and productivity.

While Mrs. Harrisons' educational background is unclear, undisputed summary judgment evidence indicates that she had a proclivity for carefully studying important documents. For example, before buying a home, Mrs. Harrison consulted an attorney and scrutinized transaction documentation. Before purchasing a car, she conscientiously reviewed the sales papers. Characteristically, Mrs. Harrison performed a cautious examination of the release agreement in issue. She examined the document for several weeks (although it is simply written and barely 4 pages in length) and discussed signing it not only with friends and relatives but also with her attorneys.

The availability of legal counsel focuses the Court's inquiry on the next crucial factor in determining whether the Harrison's settlement was reached knowingly and voluntarily. *See, e.g., Rogers,* 781 F.2d at 456. The Harrisons admit that they had the services of attorneys Hill and Wise prior to and during the negotiation of the release agreement. Mr. Hill reviewed the release agreement with the Harrisons before they signed it. The record is quite clear that the Harrisons contributed significantly to the language contained in the release agreement and had ample opportunity to modify it. Mr. Hill worked with the school district's attorney to negotiate modifications and revisions that the Harrisons suggested. Even the provision in which the school district was released from "all claims known or unknown" was the subject of a requested revision by Mrs. Harrison. She proposed that the word "future" be removed from an earlier draft which indicated that the Harrisons forgave the school district "for all known and unknown *and*

*future litigation or charges."* (Emphasis Added).

Finally, when evaluating the validity of a release, the Court must examine the language of the agreement for its clarity of expression and lack of ambiguity. *See, e.g., Rogers,* 781 F.2d at 456. Here, the release agreement is a model of lucidity. It is written in simple, ordinary terms, relatively free of bothersome legal abstractions or empty formalism. The document is entitled "Agreement and Release," and the word release appears eight times within its text. The scope of the Harrisons' release is conveyed in clear, comprehensible language: they agreed to "release and discharge the Arlington Independent School District from any and all claims they have or might have had as of [the date the agreement was signed], whether known or unknown."

When confronted with overwhelming evidence that they freely relinquished any claims against the school district, the Harrisons present what could be characterized, most favorably, as a creative, but dismally unconvincing, tautology. Essentially, the Harrisons contend that if they had *known* of certain alleged bad acts committed by Dr. Wright (the former AISD superintendent) then they would not have released the school district from claims *"known or unknown."* Hence, the Harrisons' attack on the validity of the release agreement hinges on their ability to produce some probative evidence that their release was unknowing, not whether it was involuntary.[1]

The Harrisons have contrived the following scenario which they characterize as fraud sufficient to invalidate the release agreement. They begin by casting aspersions against the former AISD superintendent, alleging that Dr. Wright was receiving, and would continue to receive, kickbacks from a computer vendor with whom he hoped the school district would do

---

**1.** As to the issue of voluntariness, the record is entirely devoid of evidence indicating that the Harrisons were somehow coerced into agreeing to the terms and conditions of the release agreement against their will or better judgment. A

glib reference to a state of heightened anxiety surrounding the events which followed Mr. Harrison's abrupt termination will not make it otherwise.

business.[2]  Upon learning that Mr. Harrison was opposed to the proposed hardware purchases, Dr. Wright devised an elaborate plot to effect Mr. Harrison's firing.  At the time the Harrisons signed the release agreement, they contend that they were unaware that Dr. Wright had allegedly engaged DH & S for the purpose of seizing and operating the school district's data processing system.  They were also unaware that Dr. Wright allegedly instructed Mr. Harrison's new supervisor, assistant superintendent Rick Berry, that his first priority was to evaluate Mr. Harrison's ability to run the data processing department.  They were also unaware that Berry had engaged a consultant who had serious reservations about Mr. Harrison's ability to oversee the department's operations.  Thus, the Harrisons conclude that if they had only known or been aware of all the alleged acts "done intentionally to discredit" Mr. Harrison, they would have never agreed to release the school district from any liability in connection with Harrison's discharge.

■ The fallacy of the Harrisons' reasoning is readily apparent.  Their allegations are wholly irrelevant to the "knowing-release" determination.  Even if the Harrisons' allegations are assumed to be true, they relate only to a fraud allegedly perpetrated by Dr. Wright *upon the School District* for his own pecuniary gain, *not upon the Harrisons* to induce them to sign a purportedly disadvantageous release agreement.  If Dr. Wright's alleged fraudulent conduct has any relevance, it is only in an action brought by the School District against Dr. Wright.  Such an inquiry here has no place.

Moreover, allegations of the former superintendent's wrongdoing form the very basis of any claim existing at the time the release agreement was executed.  But those claims are precisely the ones which the Harrisons forgave the school district in the release agreement:  more precisely, those claims "known or unknown."  Hence, when the Harrisons freely signed a release in exchange for ample consideration, they relinquished any claims which through further or more diligent investigation they might have discovered.  "Any and all" claims, "known or unknown," means what it says.  It is an unequivocal reference to any evidence of wrongdoing the Harrisons' might have subsequently unearthed.

To the extent the Harrisons contend that their attorneys were likewise unaware of Dr. Wright's wrongdoing and thus could not properly advise them of all available causes of action, the Court can only say that their purported dissatisfaction with the legal services they received has is equally misplaced.  For example, the Harrisons claim that some of the 22 witnesses the school district's attorney listed as persons willing to testify as to Mr. Harrison's alleged incompetency, now, two years later, deny ever making such accusations.  The Harrisons argue that if their attorneys had properly investigated the school district's alleged "cause" and supporting evidence for dismissing Mr. Harrison they would have learned that charges levied against him were false.

■ To this, the Court can only reiterate the pristine language of the release agreement:  the Harrisons agreed to forebear from asserting all claims then in existence against the school district, whether known or unknown.  Before agreeing to such a provision, the Harrison had ample opportunity to initiate an investigation into the so-called "false testimony."  The summary judgment evidence is uncontradicted:  they studied provisions of the release agreement for weeks.  During this time, ready and able counsel was available to them.  At the Harrisons' insistence, various provisions were redrafted.  But at no time did the Harrisons attempt to dispute the veracity of the accusations against Mr. Harrison.  He did twice demand an opportunity to speak with the school board, and the school district willingly obliged.  Yet, Mr. Harrison never appeared before the board to impeach the witnesses' purported testimony or answer the charge of incompetency.

---

**2.**  Indeed, Dr. Wright eventually resigned over an alleged conflict of interest surrounding "around-the-world" trips he took which were sponsored by the computer vendor.

As the Seventh Circuit Court of Appeals has noted, "we do not regard competency of counsel a relevant factor for district courts to consider in evaluating whether a settlement is knowingly reached. To the extent that [the plaintiff's] discussion may have been based upon the incompetency of his counsel, his remedy lies in an action for legal malpractice, not in an action seeking to renege on a settlement agreement." *Taylor v. Gordon Flesch Co. Inc.*, 793 F.2d 858, 864 (7th Cir.1986).

## ORDER

In sum, the agreement the Harrisons entered into with the school district released all claims which existed at the time the agreement was executed. The language of the release agreement unambiguously stated that the Harrisons were relinquishing all claims, known or unknown. Mr. Harrison was well-educated and a man with considerable business experience, and both he and his wife studied the terms and conditions of the release agreement and its associated risks for weeks prior to signing it. At all times during the negotiation of the settlement and its ultimate execution, they were represented by counsel. The record is devoid of any evidence of coercion or duress sufficient to compel the Harrisons to sign the release involuntarily.

Because the summary judgment record contained no significant probative (or relevant) evidence that the Harrison's release was anything other than knowing and voluntary, and because the only attempt the Harrisons made to controvert this finding was through the submission of evidence which conclusively depicted wrongdoing they *might have discovered* at the time the release agreement was consummated, the plaintiffs have failed to sustain their summary judgment burden of proof, and, hence, the defendants' motion for summary judgment must be GRANTED. The plaintiffs' cause of action is DISMISSED with prejudice. The defendants are to recover their costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.

Because the Court finds that the release agreement bars the claims asserted in this action, the plaintiffs' attempt to join additional defendants and raise a conspiracy claim is likewise barred. Accordingly, the plaintiffs' motion for leave to file their amended complaint is MOOT. To the extent the plaintiffs attempt to raise a claim for alleged violations of the Texas Open Meetings Act, the federal claims having been dismissed, the state law claims must be dismissed as well pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

A judgment consistent with this Opinion will be entered.

It is so Ordered.

## JUDGMENT

This action came on for decision on defendants' motion for summary judgment before the Court, Honorable Eldon B. Mahon, U.S. District Judge, presiding, and the issues having been duly considered and an opinion having been rendered, it is ORDERED and ADJUDGED that plaintiffs' action be dismissed on the merits and that the costs of action be taxed against the plaintiffs.